Filed 12/24/13  P. v. Rocha CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047420 |
| v. | (Super. Ct. No. 11CF0470) |
| RICARDO GUERRA ROCHA, | O P I N I O N |
| Defendant and Appellant. | |
| In re RICARDO GUERRA ROCHA, | G048047 |
| On Habeas Corpus. | |

Appeal and petition for a writ of habeas corpus following a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Judgment affirmed. Petition denied.

Kurt David Hermansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Ricardo Guerra Rocha of second degree murder (Pen. Code, §§ 187, subd. (a), 189; all further statutory references are to this code unless otherwise indicated; count 1); and street terrorism (§ 186.22, subd. (a); hereafter § 186.22(a)); count 2). It further found true allegations he vicariously discharged a firearm, causing the victim's death (§ 12022.53, subds. (d) & (e)(1)), and committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b); hereafter § 186.22(b)). The court sentenced defendant to 15 years to life on count 1 and 25 years to life for the enhancements but stayed his sentence on count 2.

Defendant contends (1) the court erred in admitting his statements to a detective because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*), (2) insufficient evidence supports the section 186.22(b) and vicarious firearm discharge enhancements, (3) California's mandatory sentencing scheme under section 12022.53, subdivisions (d) and (e)(1) violates the Eighth Amendment as applied to juveniles, and (4) his 40 years to life sentence constitutes cruel and unusual punishment under the California Constitution.

Defendant also filed a petition for writ of habeas corpus, which we consolidated with the appeal for all purposes, raising the same *Miranda* and cruel and unusual punishment issues he asserts in his direct appeal. He also claims his trial attorney failed to provide him with effective assistance of counsel by failing to advocate on his behalf at sentencing. We affirm the judgment and deny the petition.

FACTS

Defendant's sister, Maria, drove defendant, Ivan Sanchez and Humberto Rivera to dinner one evening. Defendant, aka "Husky," had just been released from

2

juvenile hall three days earlier where he had been placed for consuming controlled substances and violating his probation terms. He and Sanchez were members, and Rivera was an associate, of the Central Myrtle Street gang. Sanchez wore a Milwaukee Brewers hat, a symbol of the gang, which defendant also owned but did not wear that night. Seven months earlier, defendant told a police officer he had been "kicking back" with the gang since he was 8 or 9 years old, that he was wearing the Milwaukee Brewers hat because he was proud to represent the gang, and would "back up his homies against all his enemies." Per gang expert Matthew McLeod, that meant "he would do anything to support his fellow gang members in whatever criminal enterprise or endeavor they chose to undergo."

At the restaurant, located about 10 minutes away from the gang's claimed territory, defendant's group had an altercation with another group. Esteban Navarrete, his wife, niece, and niece's boyfriend sat at a table between them. A video recording showed Sanchez making the Central Myrtle Street gang hand sign during the approximately 30 minute argument. According to McLeod, gang signs are "a nonverbal way of claiming a gang, showing one's dedication and membership in that gang to all those who would view it, be they rivals, perceived rivals, [or] just community members."

When defendant's group left the restaurant and went to Maria's truck, the other group "went after them" and "pushed them around." After a minute or so of back and forth pushing and shoving, defendant's group drove off.

About 15 to 20 minutes later, defendant and Sanchez approached Navarrete's group as they were entering their car. Defendant was "walking" Sanchez "like if Sanchez didn't know what he was doing" and pointed at Navarrete's car as they approached. Standing really close to each other "like they were hugging or something," either defendant or Sanchez said, "'That's the girl that beat us.'"

With defendant directly behind him, Sanchez aimed the gun at Navarrete's wife. Navarrete got out of the car and said, "'Hey, it's not us. It's over there. It's not us.'" Sanchez shot Navarrete in the head and fired at least four more shots into Navarette's car. After Sanchez stopped firing the gun, defendant pushed the gun down with his hand. Defendant pointed to the vehicle they arrived in and ran to it with Sanchez.

Five days later, defendant voluntarily went to the police station and asked to speak to a detective. He stated Sanchez had received the gun from another Central Myrtle gang member and that once the shooting was complete he told Sanchez to dispose of his clothes in order not to be linked to the murder.

According to McLeod, gang members sometimes commit crimes with non-gang members. When a gang member is disrespected in front of another gang member, he must respond immediately with an act outweighing the disrespect he incurred or risk harming his reputation in the gang and bringing disrespect on the gang as a whole. The disrespect does not have to be gang related but merely something viewed as "negative" and can include "a menacing glare," or being bumped, stepped on, or verbally discredited. The greater the violence committed, the more respect the gang member obtains, with homicide providing the highest status to all the gang members present or participating.

Testifying on his own behalf, defendant denied being a member of Central Myrtle, although he admitted being friends with members. He had been drinking whiskey, smoking marijuana, and using methamphetamine before the shooting and only had a Milwaukee Brewers hat because he was a fan of the team. He met Rivera while in juvenile hall and Sanchez the night of the shooting while he was "getting high."

4

At the restaurant, defendant, his sister, Sanchez, and Rivera had dinner and drank beer. Sanchez got into an argument with the other group and when it escalated, Rivera tried "to settle things down." Defendant told Marie they should leave when Sanchez threw up. As he was helping Sanchez, a man from the other group hit defendant and defendant fought back. The rest of the other group came out and a fight ensued between them. The members of the other group were older and bigger than defendant, Sanchez, and Rivera. Defendant and his friends left with Maria in her truck. Defendant was "pissed."

Sanchez had Maria drive to the house where he and defendant had been using drugs and drinking earlier. Sanchez left the truck, and returned with a Central Myrtle gang member, who placed a loaded gun on an empty seat in the truck. Sanchez stated he was "'going to scare this mother fucker'" while defendant wanted to "'fuck [the other group] up."

At Sanchez's request, Maria drove them back to the restaurant, entering through the back of the lot. Sanchez got out of the truck and when he pointed the gun, defendant hit him on the hand. Sanchez kept walking and defendant did not try to stop him because he was scared Sanchez would shoot him.

Upon seeing Navarrete, defendant believed he was one of the men who had attacked him earlier. Sanchez fired several shots at Navarrete and his vehicle, which defendant knew contained other passengers. Defendant pushed him, saying, "'What the fuck'" and took the gun away once they entered Maria's truck. Defendant told Sanchez to get rid of his clothes to prevent his DNA from being discovered and identifying him as the shooter. Maria dropped Sanchez off where he obtained the gun, and defendant went to find a friend with whom he "got high."

5

DISCUSSION

*1. Miranda Violation*

Defendant contends the court erred in denying his motion to exclude the statements he made at the police station because he was not informed of his *Miranda* rights. In his petition for writ of habeas corpus, he asserts he would not have testified at trial if those statements had not been admitted.

*a. Relevant Proceedings*

Dean Fulcher, the detective conducting the interview, testified at trial that between the night of the shooting and the day defendant went to the police station, police obtained a video showing defendant, Sanchez, and Maria at the restaurant and disseminated it to the press. Although defendant had not been identified as a participant in the murder and had not been summoned by anyone in the department, he walked into the police station lobby with Maria and asked to speak with a detective.

Fulcher did not know what information defendant intended to share and did not handcuff him or place him under arrest. Unlike the standard procedure in a homicide case where two detectives conduct the interview, Fulcher spoke with defendant alone in a room. During the hour-long interview, Fulcher never became confrontational or raised his voice.

Fulcher began by turning on a recording device and telling defendant he was not in custody or under arrest, was free to leave at any time, and the only reason he closed the door was for privacy. He asked defendant his age and defendant responded he was 17 years old. Fulcher then asked what defendant wanted to talk about.

6

Defendant gave a narrative of his version of what happened the day of the shooting, including the dinner, the argument with the other group, and the fight outside the restaurant. Afterwards, he and Maria dropped his friends off and went home. Fulcher did not interrupt defendant except to say "yes," "okay," "right," and "uh-huh." He also asked several follow up questions, such as who else was involved that evening.

After defendant denied knowing where Sanchez and Rivera were, Fulcher tapped his finger on their photographs and said "three hots and a cot, brother." Fulcher fabricated the existence of surveillance footage from the restaurant's parking lot showing them returning in Maria's truck to the restaurant, defendant and Sanchez getting out and walking up to Navarrete, and Sanchez shooting him. Fulcher told defendant Sanchez had turned himself in and confessed to the shooting and that the problem for defendant was the video showed him walking up to Navarrete with Sanchez. He advised him to help himself by using his own words to explain what happened.

Following a 20-second pause, Fulcher said he knew defendant's group had been drinking and "not thinking straight" and were "pissed off," but that "[t]he good thing for you [is] you're not the one who . . . pulled the trigger. We . . . know it's him and we've got him. You're still involved in this whole thing, and that's why it's important for you to kind of lay out in your words what happened. Okay. I know it's kind of difficult, I'm sure you probably don't [want to] talk about it, it's uncomfortable, but . . . I mean you came down here I think to clear your conscie[nce], and . . . you're about halfway there, now it's time to take that next step; which is the more difficult step. I understand, especially you, you're a young kid, got your whole life ahead of you, . . . but just keep in mind we know what happened. I'm just giving you an opportunity to say it in your own words."

7

After a 15-second pause, Fulcher asked if it "would . . . be easier if [he] just asked [him] questions and [defendant] answere[ed] them?" Another 5 seconds ensued and defendant said something unintelligible, followed by a 20-second pause. Fulcher then started asking questions beginning with where they obtained the gun. Defendant answered "[o]n Myrtle" after a 5-second pause.

Fulcher asked if they called someone in advance or if they just went over to Myrtle. When defendant did not respond after 30 seconds, Fulcher inquired who actually obtained the gun, to which defendant immediately responded, Sanchez, and that he "just had to pick it up from somebody." Defendant did not answer right away whether Sanchez had to go into a house or if someone just gave him the gun, prompting Fulcher to say, "Hey, Ricardo." Defendant said something unintelligible and 5 seconds later, answered, "Someone gave him the gun."

Fulcher questioned whether defendant was "pissed off" and after 5 seconds defendant answered he was. Fulcher said, "Rightfully so. You're only 17," to which defendant responded, "Yeah." When asked if defendant's group explained why they needed a gun, defendant said he and Sanchez both did.

Fulcher inquired where everyone was sitting in the truck and if Sanchez said what he was going to do. Defendant answered, Sanchez said he was "just gonna scare this mother fucker." But when they returned to the parking lot, the only person they saw was Navarrete getting into his car. He then described getting out of the car with Sanchez, walking behind Sanchez toward Navarrete, and Sanchez shooting him. Defendant was shocked and pushed Sanchez when he continued shooting. Defendant took the gun away from him and told him he was stupid, at which point Sanchez hit him. Once back in Maria's truck, Sanchez took the gun back.

8

Maria dropped Sanchez and Rivera off where they had obtained the gun and went home. Maria was scared and suggested they go to the police, which defendant agreed was the right thing to do. When Fulcher asked if defendant wanted to "go back and fuck these guys up," defendant said "yeah, but . . . not with the strap [i.e., gun]."

Fulcher told defendant the law made each of them responsible for the shooting and asked about Sanchez's clothes. Defendant admitted telling Sanchez to get rid of his clothes so the police could not connect him with the shooting. At the end of the interview, Fulcher convinced defendant to provide a DNA sample. The probation report indicates defendant was arrested at that point, although a complaint was not filed until four days later.

At the suppression hearing, the court noted the interview had been "warm and fuzzy" up to when Fulcher asked where they had picked the gun up and asked Fulcher if he would have allowed defendant to leave at that point. Fulcher responded that he would not have handcuffed him but would have contacted the lead detective for instructions and they might have stopped him "before he made the parking structure, or something like that" or they could have obtained a warrant and picked him up later.

Defendant then testified he had discussed what happened with Maria and they both decided it would be best for him to go in because he "had nothing to hide" and did not kill Navarrete. When asked at the station why he was there, he said "to tell the truth what happened . . . about the incident." He was under the influence of methamphetamine, alcohol, and marijuana during the interview, although he did not tell Fulcher that; he "was nervous[ and] . . . just want[ed] to say the truth." After the interview, defendant still believed he had nothing to fear or hide by going to the police station.

9

The court found defendant had conducted himself well during the interview despite his age of 17 and purported substance abuse.  Although *J.D.B. v. North Carolina* (2011) 564 U.S. ___ [131 S.Ct. 2394, 180 L.Ed.2d 310] (*J.D.B.*) required it to consider a juvenile's age in its *Miranda* analysis, the court noted no special rules govern whether a juvenile is in custody.  In light of these circumstances, plus the fact defendant entered the police station voluntarily, which "change[d] the issue pretty significantly," the court denied the suppression motion.

### b. Analysis

Defendant argues the court erred in concluding no interrogation occurred and that he was not in custody because the voluntary encounter became a custodial interrogation.  We reject his claim he was in custody after Fulcher "confronted [him] with evidence of guilt in the bowel's [sic] of the police department in an interrogation room" and thus need not discuss whether defendant was subjected to interrogation.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'  [Citation.]  Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.  [Citations.]  When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation.  [Citation.]  All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present."  (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).)  This determination "'is a mixed question of law and fact.  [Citation.]  When reviewing a trial court's determination that a defendant

10

did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave."'" (*Ibid.*)

Defendant contends the court erroneously looked at Fulcher's subjective belief and ignored defendant's age. Neither assertion persuades us to reverse.

We agree with defendant that Fulcher's subjective belief about defendant's custodial status was not relevant to whether defendant was actually in custody because the determinative question is how a reasonable person in the defendant's position would view the circumstances. (*Moore*, *supra*, 51 Cal.4th at p. 395.) But asking Fulcher what he would have done had defendant attempted to leave does not mean the court relied on that to make its determination. If it had, it probably would have concluded defendant was in custody given Fulcher's statements that although he would not have handcuffed him, he would have contacted the lead detective for instructions and they might have stopped him "before he made the parking structure." In fact, the court noted that "once inculpatory statements start[ed] to be made [Fulcher] should have then said, 'well, here is your *Miranda*.'" It found, however, the fact defendant voluntarily walked in to the police station made "a big, big difference."

*In re Kenneth S.* (2005) 133 Cal.App.4th 54 (*Kenneth S.*) is instructive. There, a police officer telephoned a minor's foster mother and asked if she would voluntarily bring the minor and his brother to the police station for questioning about "'crimes that had occurred in the neighborhood.'" (*Id.* at p. 59.) At 7:00 a.m. the following morning, the foster mother brought the boys to the station. They were all buzzed into a security area and taken upstairs to an area where civilians were not allowed

to "'just roam around.'" (*Ibid*.) The boys were escorted to separate rooms. After the foster mother agreed to allow the minor to be interviewed alone, the detective placed the minor in a small room with the door partially open and the foster mother in a room about 10 feet away. In the recorded interview, the detective thanked him for volunteering to come to the station, and told him he was not under arrest and was free to leave at any time. (*Ibid*.) *Miranda* warnings were not given before the interview. Twenty-five minutes into the interview, the detective began asking about the robbery and eventually the minor admitted to committing the robbery. (*Ibid*.) After the questioning ended, the detective informed the minor of his *Miranda* rights and detained him. (*Id*. at p. 60.)

*Kenneth S.* concluded that the minor "was subjected to neither actual nor constructive restriction on his freedom." (*Kenneth S*., *supra*, 133 Cal.App.4th at p. 65.) He came to the station voluntarily with his foster mother. The detective "told him that he was not under arrest and was free to leave." (*Ibid*.) The court held that the fact the interview took place in the police station did not demonstrate a constructive restriction on the minor's freedom and a reasonable person in the minor's position would not have understood he was in custody within the meaning of *Miranda*. (*Ibid*.)

Defendant distinguishes *Kenneth S*. on the basis the interview door there was partially open, his foster mother was only 10 feet away, and the detective stated "he had information that [Kenneth S.] was involved in" a robbery (*Kenneth S*., *supra*, 133 Cal.App.4th at p. 59), whereas here defendant was "interrogated in a closed room in the interior of the police department with no one nearby . . . [a]nd Fulcher did not merely tell [him] that he had information that he was involved in a crime[ but] . . . repeatedly confronted [him] with specific evidence of his guilt in a murder case." But Fulcher explained to defendant the door was only closed for privacy reasons and that defendant could leave at any time. Additionally, Maria was in the station nearby, having

12

accompanied him there, and there is no evidence she asked to go with him to the interview room.

As to confronting defendant with evidence showing guilt, we are guided by *Moore*, *supra*, 51 Cal.4th 386. There, the defendant agreed to accompany an investigator to the sheriff's station and give a statement about the murder of his 11-year-old neighbor, which occurred during the burglary and robbery of her home. (*Id*. at pp. 390, 391, 396.) Upon arrival at the station, deputies confirmed they only wanted a statement and would take the defendant home afterward. They did not handcuff or otherwise restrain the defendant. Although the door to the interview room locked automatically, a deputy left his keys in the door or used a wedge to prevent it from closing and locking. A deputy told the defendant he "was 'not under arrest or anything' and was there only to make a statement because he was the last person to have seen the victim . . . and was 'free to go or whatever.'" (*Id.* at p. 398.)

After the defendant informed deputies when he had last seen the victim and gave information on missing fence boards, an attempted burglary on another neighbor's residence, and prowlers purportedly seen in the area (*Moore*, *supra*, 51 Cal.4th at pp. 391-392, 398), the investigator asked a series of questions that *Moore* characterized as "accusatory and skeptical . . . , with [one detective] asking . . . straight out, 'Did you burglarize the house?' and, later, urging him to begin being 'honest with me.' The detectives' questions about [the] defendant's prior arrests, drug use, need for money, and carrying of a knife and other weapons on the day of the crimes conveyed their suspicion of [the] defendant's possible involvement." (*Id*. at p. 402.) In holding the hour and 45 minute interview was "not, as a whole, particularly intense or confrontational" (*ibid.*), *Moore* explained "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police

13

suspect.' [Citation.] While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody. [Citation.] At least until defendant first asked to be taken home and his request was not granted, a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Id*. at pp. 402-403, italics omitted; citing *Oregon v. Mathiason* (1977) 429 U.S. 492, 493-495 [97 S.Ct. 711, 50 L.Ed.2d 714] [defendant not in custody where he agreed to interview at police station behind closed doors, was told he was not under arrest, and was allowed to leave when interview ended, despite police stating they suspected him of burglary and falsely claiming his fingerprints had been found] (*Mathiason*).)

*Moore* also contrasted its facts from those in *People v. Boyer* (1989) 48 Cal.3d 247 (*Boyer*), disapproved another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1. As *Moore* explained, in *Boyer*, the facts "police 'accosted' the defendant at his home," administered "*Miranda* advisements at the interrogation's outset," subjected the defendant "to 'more than an hour of directly accusatory questioning' . . . in which he was falsely told the police had the evidence to prove his guilt, and [ignored defendant's questions about whether he was under arrest, his requests for an attorney, and his statements he no longer wanted to talk]—showed he had in fact been arrested, making his interrogation custodial for *Miranda* purposes." (*Moore*, *supra*, 51 Cal.4th at p. 403.) By contrast in *Moore*, the defendant was initially contacted, not as a homicide suspect, but as a witness with information about the burglary and possible abduction of the victim. And "[e]ven when the interviewers began to express some skepticism about defendant's statements, they did not claim to know he was guilty or, until the point investigator

14

Hanson expressly arrested him, to have evidence of his guilt. Unlike the defendant in *Boyer*, moreover, defendant was not detained while trying to leave his house, nor did the police repeatedly ignore statements that he wanted a lawyer and did not want to talk to them further." (*Ibid*.)

Defendant claims *Boyer* relied on only two factors in determining the defendant was in custody: (1) "the police read defendant his *Miranda* rights at the station, a strong indication that they themselves considered the interrogation 'custodial'"; and (2) "in an intense interrogation spanning nearly two hours, they led defendant to believe that suspicion had focused on him, that they considered him guilty, and that they had the evidence to prove his guilt in court." (*Boyer*, *supra*, 48 Cal.3d at p. 272, italics omitted.) But *Boyer* also recognized that "[i]n deciding the custody issue, the totality of circumstances is relevant, and no one factor is dispositive." (*Ibid*.) Viewing the evidence in that light, *Boyer* is distinguishable here for many of the same reasons stated in *Moore*.

As in *Mathiason*, *Moore*, and *Kenneth S*., defendant was not detained as he tried to leave his home but rather went to the police station of his own accord "to tell the truth [about] what happened" because he "had nothing to hide" and did not kill Navarrete. In that respect, this case is even more compelling than *Mathiason*, *Moore,* and *Kenneth S*. in that he did so without being asked by police.

Defendant was placed in an interview room but was not physically restrained at any time. He was not administered *Miranda* warnings at the outset of the interrogation as in *Boyer* but shared his story voluntarily and was expressly told he was not under arrest, was free to leave at any time, and that the door was closed only for privacy reasons. There is no evidence the door was locked or that Fulcher would have not opened it upon request. Fulcher never raised his voice or became confrontational

15

during the interview, which lasted only an hour, not two hours as in *Boyer*, and only a portion of that consisted of the questioning that defendant deems "accusatory."

That Fulcher falsely told defendant the police had surveillance footage from the restaurant's parking lot, on which they saw defendant and Sanchez exit from defendant's sister's car and Sanchez walk up to Navarrete and shoot him, showed that police were skeptical about defendant's statements up to that point (*Moore*, *supra*, 51 Cal.4th at pp. 402-403) and that they "had information [he] was involved in" the crime (*Kenneth S.*, *supra*, 133 Cal.App.4th at p. 59). But unlike in *Boyer*, Fulcher expressly stated he knew defendant was not guilty as the shooter. And the fact the police did not actually have surveillance footage "had nothing to do with whether [defendant] was in custody for purposes of the *Miranda* rule." (*Mathiason*, *supra*, 429 U.S. at p. 496.) At no time did defendant request to be taken home or to end the interview; to the contrary, he believed he had nothing to fear or hide even after the interview. Moreover, in contrast to the defendant in *Boyer*, defendant neither asked whether he was under arrest, stated that he wanted a lawyer, nor indicated he no longer wanted to talk. The police thus had no occasion to repeatedly ignore such statements. Under the totality of the circumstances, as well the reasoning of *Mathiason*, *Moore*, and *Kenneth S.*, a reasonable person in defendant's position would not have understood he was in custody.

Defendant maintains his custodial status was demonstrated by the fact "[h]e could not use the restroom unless Fulcher accompanied him, and he could not open the door on his own." But that is not what the record reflects. When defendant asked if he could use the restroom, Fulcher said, "Yeah, absolutely," and then asked if he wanted to "do that right now or . . . wait until I get that [consent to take his DNA] form and come back?" When defendant said he did not know, Fulcher asked if he had to "go real bad," to which defendant responded he "could wait." Although Fulcher closed the door behind

16

him as he left the room, he told defendant to knock if he needed anything because they could not allow people to wander the halls. Defendant answered, "Alright." The tone of this colloquy was not confrontational and gave defendant the options of when to go to the restroom and to request anything he needed by knocking on the door; it does not suggest a reasonable juvenile in defendant's position would feel that he was not free to leave.

Defendant contends the court also erred by failing to apply the test set forth by *J.D.B.*, *supra*, 564 U.S. __ [131 S.Ct. 2394], which held that a juvenile suspect's age must be taken into account when considering the *Miranda* custody analysis. (*Id*. at p. __ [131 S.Ct. at pp. 2402-2403].) But the court pointed out "[t]his is not to say that a child's age will be a determinative, or even a significant, factor in every case" (*id*. at p. 2406) and the majority specifically noted that omitting a suspect's age was not unreasonable when the suspect "'was almost 18 years old at the time of his interview'" (*ibid.*). The record here similarly demonstrates that on the date of his interview at the station defendant was less than three months short of his 18th birthday. It thus would have been reasonable for the court to have not considered his age. But it did consider it, expressly noting how well defendant conducted himself during the interview despite his age and claim that he was high and drunk. In light of this, we reject defendant's claim the court did not consider his age just because it said "juvenile[s do] not having any special rules for determining whether someone is in custody or not."

We conclude the interview of defendant was not custodial and did not trigger the need for *Miranda* warnings. Because the trial court thus did not err in denying his suppression motion, his petition for writ of habeas corpus on this ground fails.

17

*2. Sufficiency of the Evidence to Support Enhancements*

Defendant contends insufficient evidence supports the jury's finding he specifically intended to promote, further, or assist a gang member's criminal conduct as required for the gang enhancement under section 186.22(b) and the vicarious firearm discharge enhancement under 12022.53, subdivisions (d) and (e)(1). (See *People v. Mejia* (2012) 211 Cal.App.4th 586, 614-615.) We disagree.

The gang enhancement under section 186.22(b)(1) requires proof the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." The enhancement thus has two prongs—the benefit prong and the intent prong. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) Defendant disputes only the latter.

In particular, defendant notes there was no evidence Navarrete's family knew defendant or Sanchez were gang members, no percipient witness saw anyone flash a Central Myrtle hand sign in the restaurant despite a surveillance video showing an unknown person making the sign, and that neither he nor Sanchez identified their gang affiliation when Sanchez shot Navarrete. But nothing in the statute requires defendant promote the gang during the offense, only that he promote (or further or assist) criminal conduct by a gang member. (*People v. Albillar* (2010) 51 Cal.4th 47, 64-67 (*Albillar*).) This is most often satisfied by evidence the defendant committed the crime with other known gang members. From evidence "the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id*. at p. 68; see also *People v. Livingston* (2012) 53 Cal.4th 1145, 1171 ["'[I]f substantial evidence establishes that the defendant intended to and did commit the

18

charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members'"].)  Here, defendant concedes he committed the offense with Sanchez, an active gang member.  Accordingly, defendant's intent can be inferred from the circumstances of the offense.  The second prong was satisfied by substantial evidence.

*People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*), cited by defendant, does not compel a different result.  That case addressed the sole issue of whether a gang member acting alone in committing a felony violates section 186.22(a).  In concluding the answer is no (*Rodriguez* at pp. 1128, 1139), the court distinguished section 186.22(b)(1), which it acknowledged requires "the defendant to act with the *specific intent* to promote, further, or assist any criminal conduct by gang members." (*Rodriguez*, at p. 1130, fn 5.)  Later, it favorably cited *Albillar* in paraphrasing section 186.22(b)(1) to mandate "both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang" in order to "to alleviate due process concerns."  (*Rodriguez*, at p. 1139; see also p. 1138 [section 186.22(b)(1) "punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang"].)  It did not address whether section 186.22(b) requires a defendant to have the specific intent to promote the gang during the offense in question.  Nor did it state the necessary specific intent may *not* be established by evidence a defendant assisted in criminal conduct by another gang member.  Defendant's argument that *Rodriguez* "impliedly overruled" *Albillar* thus lacks merit.

Defendant also relies on *In re Daniel C.* (2011) 195 Cal.App.4th 1350 and *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*) to argue there was no evidence he had the specific intent to benefit the Central Myrtle gang.  His reliance on these cases is misplaced.  *In re Daniel C.* concluded the evidence was insufficient to support the

19

specific intent element of the gang enhancement, noting there was no evidence the defendant was acting in concert with his companions when he robbed a liquor store or that his companions committed or were charged with any crime. (*In re Daniel C*., at pp. 1359-1364.) The same is not true here. In *Ramon*, members of the same gang stole a truck together. A gang expert testified the crime benefitted the gang because they could commit other crimes with the stolen truck. *Ramon* held the expert's opinion was improper because there were no facts from which he could discern whether the men were acting on their own behalf or on behalf of the gang. (*Ramon*, at p. 851.) *Ramon*'s focus was on the sufficiency of the evidence that the crime was committed for the gang's benefit. (*Id*. at p. 849.) But to the extent *Ramon* addressed the specific intent issue, *Ramon* framed the issue as whether the defendant had the specific intent to promote the criminal street gang (*id*. at pp. 849, 853) as opposed to whether the defendant had the specific intent to promote, further, or "assist in any criminal conduct by gang members" (§ 186.22(b)(1)). When the issue is framed as whether the defendants intended to promote or benefit the gang, *Ramon*'s conclusion there was insufficient evidence is understandable because there was no evidence gang slogans were shouted or of other indicia that commonly denote a gang crime. It becomes less so when the issue is framed according to the actual language of the statute.

Defendant maintains "*Rodriguez* shows that *Ramon* correctly interpreted section 186.22(b)(1)'s specific intent element as requiring proof of the intent to promote a gang, i.e., that the offense was gang-related." But as noted above, *Rodriguez* did not actually address the proof requirement for the second prong of the statute whereas *Albillar* specifically rejected the contention defendant makes, stating "[t]he enhancement already requires proof that the defendant commit a gang-related crime in the first prong— i.e., that the defendant be convicted of a felony committed for the benefit of, at the

20

direction of, or in association with a criminal street gang. [Citation.] There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar*, *supra*, 51 Cal.4th at p. 67.) We are bound by *Albillar*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Defendant's claim the offense must be gang related goes to the first prong of section 186.22(b)(1), i.e., whether the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang." But he did not challenge this prong in his opening brief. In any event, the first prong is satisfied under the plain words of the statute by a crime committed "in association with any criminal street gang." (§ 186.22(b)(1); see also *Albillar*, *supra*, 51 Cal.4th at p. 60.) It may also be inferred from expert testimony that "particular criminal conduct benefited a gang by enhancing its reputation for viciousness . . . ." (*Albillar*, at p. 63.) Here, defendant committed the offense in association with a known gang member and a prosecution expert testified that a disrespected gang member must respond immediately with an act outweighing the disrespect directed at him and the greater the violence, the more respect the gang member obtains. Substantial evidence thus supports a finding defendant and Sanchez "came together *as gang members* to attack [Navarette] and, thus, that they committed these crimes in association with the gang" (*id*. at p. 62) and for the benefit of the gang in retaliation for being disrespected and to enhance the gang's reputation for viciousness (*id*. at p. 63).

We are satisfied that substantial evidence supports the jury's true finding on the gang allegation and thus affirm its findings on the enhancements under both sections 186.22(b)(1) and 12022.53, subdivisions (d) and (e)(1).

21

*3. Constitutionality of Section 12022.53 as Applied to Juveniles*

The court sentenced defendant to a mandatory 15-year-to-life term for the second degree murder and a mandatory 25-year-to-life term under section 12022.53, subdivisions (d) and (e)(1), resulting in a mandatory sentence of 40 years to life. Defendant contends this sentence violates the Eighth Amendment because "section 12022.53's mandatory sentencing scheme is unconstitutional as applied to juveniles[, as it] . . . eliminated the trial court's discretion to consider the mitigating circumstances of [defendant's] youth." (Bold omitted.) He acknowledges he did not object to the enhancement on that ground and, therefore, "technically forfeited his Eighth Amendment challenge to his 40-years-to-life sentence" but urges us to reach the merits of his claim to avoid an ineffective assistance of counsel claim. We shall consider the argument on the merits.

Defendant relies on recent federal and state high court case law, namely *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*), *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct 2011, 176 L.Ed.2d 825] (*Graham*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), for the proposition that the court must have discretion to consider the mitigating circumstances of his youth. But these cases are distinguishable because they involved juveniles whose sentences were either (1) life without possibility of parole (LWOP) (*Miller*, at p. 2460; *Graham*, at p. 2020) or (2) a term of years so long as to be the functional equivalent of LWOP (*Caballero*, at p. 268). As we recently explained, the cases dealing with the permissible length of a juvenile offender's sentence "follow a remarkably consistent pattern. There is a bright line between LWOPs and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole. We are aware of—and have been cited to—no case which has used the . . . *Graham–Miller–*

22

*Caballero* line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole." (*People v. Perez* (2013) 214 Cal.App.4th 49, 57, fn. omitted (*Perez*).)

In *Perez*, we rejected an Eighth Amendment challenge by a 16-year-old defendant who had been sentenced to a term of 30 years to life in prison. (*Perez*, *supra*, 214 Cal.App.4th at pp. 51, 57-58.) We acknowledged that "[h]ow *much* life expectancy must remain at the time of eligibility for parole of course remains a matter for future judicial development," but because the defendant there would be eligible for parole when he reached the age of 47, we held "there is plenty of time left for Perez to demonstrate, as the *Graham* court put it, 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Id*. at pp. 57-58.) Because the defendant's sentence could not be considered a "'functional'" or "'de facto' LWOP," neither *Miller*, *Graham*, nor *Caballero* applied. (*Perez*, at p. 58.)

Similarly, here, defendant was 17 years old at the time of his offense and sentenced to 40 years in prison with 574 days of credit for time served. He will become eligible for parole long before the end of his life expectancy. Like the juvenile defendant in *Perez*, defendant will have ample time to obtain release based on demonstrated maturity and rehabilitation. (*Perez*, *supra*, 214 Cal.App.4th at pp. 57-58.) Thus, for the reasons stated in *Perez*, we conclude that the *Graham–Miller–Caballero* line of cases does not assist defendant.

Defendant maintains in both his direct appeal and his writ of habeas corpus petition that his own research shows his life expectancy is 33.3 years. He cites the 2005 Federal Sentencing Sourcebook and claims his sentence is functionally equivalent to life without parole.

23

We reject the claim because defendant has not (1) attached either the sourcebook or the relevant pages of the sourcebook to his opening brief or habeas corpus petition, (2) demonstrated the relevancy of 2005 federal sentencing statistics to defendant's 2012 sentence in this California case, or (3) cited the most recent 2012 edition of the Federal Sourcebook, which can be found at http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2012/sbtoc 12.htm. As the Attorney General notes, the 2012 edition reports that only 2.2 percent of the male offenders in the study were under 21 years old (*id.* at table 7) and thus does not support defendant's claim he will probably die in prison in 33.3 years.

*4. Cruel and Unusual Punishment*

Defendant argues his sentence of 40 years to life violates the ban on cruel and unusual punishment under the California Constitution because it was grossly disproportionate to his culpability. Again we address the contention despite defendant's failure to object in the trial court given the ineffective assistance of counsel claim made in his writ of habeas corpus petition.

The basic test of a cruel or unusual punishment under the California Constitution is whether it is so disproportionate to the crime as to shock the conscience and offend fundamental notions of human dignity. (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*); *In re Lynch* (1972) 8 Cal.3d 410, 424.) The defendant must demonstrate the punishment is disproportionate in light of (1) the nature of the offense and defendant's background, (2) more serious offenses, or (3) similar offenses in other jurisdictions. (*Lynch*, at pp. 425-427.) The record must be viewed in the light most favorable to the sentence (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496), and

24

defendant must overcome a considerable burden in convincing us that his sentence is disproportionate (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196-1197).

Defendant addresses only the first *Lynch* factor, contending his "sentence is grossly disproportionate to his individual culpability because (1) he was a juvenile when he committed the offense, and (2) his accomplices's sentences were comparatively disproportionate relative to their culpability." But courts have upheld consecutive sentences for murder and firearm use enhancements even as applied to juveniles. In *People v. Em* (2009) 171 Cal.App.4th 964, we affirmed two consecutive 25-year-to-life sentences imposed on a 15-year-old gang member for actively aiding and abetting felony-murder and a firearm enhancement under section 12022.53, noting "a sentence enhancement of 25 years to life is not disproportionate to a violation of . . . section 12022.53; the Legislature has determined that a significant increase in punishment is necessary and appropriate to protect citizens and deter violent crime." (*Em*, at p. 973; see also *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 12-13.)

Moreover, the record supports the court's finding that "during this entire process [defendant] was present and giving guidance and direction to the shooter. The conduct of the defendant was cold blooded and cowardly. [¶] The victim . . . was particularly vulnerable because he was unarmed, he was an innocent bystander, and at the complete mercy of the defendant and his co-conspirators. The evidence was clear that the manner in which the crime was carried out indicates planning and sophistication and with a calculated effort." In this regard, defendant was the one who pointed out Navarrete's vehicle when he and his cohorts returned to the restaurant. He stood behind Sanchez when Sanchez shot at Navarrete and his family, and when Sanchez was out of bullets, lowered Sanchez's gun, directed him back to the escape vehicle, and told Sanchez to dispose of his clothing so he could not be connected to the shooting.

25

The court further found defendant, although only 17 years old when he committed the offenses in this case, had already shown he posed "a serious danger to society. [¶] . . . By his own statements and testimony, he has chosen the criminal street gang lifestyle, and he claimed that lifestyle in 2009 and 2010." The probation report confirms "[t]he violent nature of the instant offense demonstrates his behavior has escalated to a level which endangers the community . . . [and] his poor progress on probation clearly demonstrates it is no longer possible to safely supervise him at the local level."

Defendant analogizes this case to *Dillon*, *supra*, 34 Cal.3d 441, which found punishment for first degree murder constituted cruel and unusual punishment where the defendant was an unusually immature 17 year old, in no prior trouble with the law, who shot the victim in response to a suddenly developing situation which he perceived as threatening to his own life; while defendant largely created the threatening situation, his immaturity prevented him from seeing the risk he created or from extricating himself from the situation without panicking. (*Id*. at p. 488.) Here, by contrast, there is no evidence that defendant was unusually immature and the court found to the contrary. He did not act in panic to defend himself but purposely went back to the restaurant with Sanchez, knowing Sanchez was armed. He had a history of gang involvement and criminal behavior and had just been released from juvenile hall three days before the shooting in this case. *Dillon* thus does not aid defendant.

In both his direct appeal and his writ of habeas corpus petition, defendant compares his sentence with those received by Maria and Sanchez, of which we granted his request for judicial notice, and the fact Rivera was not charged with any crime. The California Supreme Court has "'consistently rejected the contention that intercase proportionality review is required' [citation], even as to codefendants." (*People v.*

26

*Gurule* (2002) 28 Cal.4th 557, 663.) In any event, Maria's case was different because she pleaded guilty to voluntary manslaughter and a gang enhancement and in exchange received a 16-year sentence. That does not show defendant's sentence was disproportionate to hers. As to Rivera, defendant acknowledges it is unclear what role Rivera played in the shooting and the prosecutor may not have filed charges against him for that reason. Regardless, the decision regarding who to prosecute and what to charge is a matter within the prosecutor's discretion (*People v. Cheaves* (2003) 113 Cal.App.4th 445, 453), and a comparison of the prosecutor's decision with respect to Maria and Rivera does not establish defendant received a grossly disproportionate or shocking punishment.

Defendant also measures his sentence against the one Sanchez received, a maximum life sentence of 50 years to life for first degree murder and personally discharging a firearm. But because Sanchez was more culpable as the one who fired the gun, he received a higher sentence; by contrast defendant is eligible for probation 10 years earlier than Sanchez. Defendant does not explain how that is disproportionate relative to their culpability.

*Perez* was "not among those 'exquisitely rare' cases which merit reversal on traditional disproportionality review." (*Perez, supra*, 214 Cal.App.4th at p. 60.) Neither is this case.

5. *Ineffective Assistance of Counsel*

In his writ of habeas corpus petition, defendant asserts his counsel was ineffective because he failed to argue his sentence was unconstitutional under *Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455], and did not present mitigating evidence of defendant's youth and inexperience. To prevail on a claim of ineffective assistance,

27

defendant must show his attorney's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) Defendant failed to satisfy his burden.

We have already concluded *Miller* does not apply to make section 12022.53's mandatory sentencing scheme unconstitutional. Because defendant's sentence was not unconstitutional, it follows that his counsel was not ineffective for failing to argue that it was. And given that his sentence was statutorily mandated, trial counsel's decision not to present evidence of defendant's youth and inexperience was entirely reasonable, notwithstanding counsel's declaration that he "had no tactical reason for not presenting mitigating evidence at [defendant's] sentencing hearing[ because he] assumed that the statutorily mandated sentence mooted arguments in mitigation."

DISPOSITION

The judgment is affirmed. The petition for a writ of habeas corpus is denied.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

IKOLA, J.

28